UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PATRICIA M. MERRITT, et al.,

        Plaintiffs,

                                 CASE NO. 2:06-CV-14342

    v.                             JUDGE STEPHEN J. MURPHY, III

                                 MAGISTRATE JUDGE PAUL KOMIVES

INTERNATIONAL ASSOCIATION
OF MACHINISTS AND AEROSPACE
WORKERS, et al.,

        Defendants.

_____/


**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (docket #35) and DEFENDANTS' MOTION FOR RULE 11 SANCTIONS
(docket #37)**

RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   Defendants' Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      A.    *Summary Judgment Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      B.    *Timeliness of Plaintiffs' Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
           1.    *The Limitations Period Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
               a. Claims Relating to Bankruptcy Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 18
               b. Claims Relating to Accretion Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      C.    *Duty of Fair Representation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
           1.    *Duty of Fair Representation Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
               a. Accretion Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
               b. Bankruptcy Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
               c. Plaintiffs Who Failed to Respond to Requests for Admission . . . . . . . . . . . . . . . . 33
           4.    *Objector Status Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
               a. Mootness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
               b. Merits of the Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
      D.    *Defendants' Motion for Rule 11 Sanctions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
           1.    *Rule 11 Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
           2.    *Whether Plaintiffs' Counsel Violated Rule 11* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
               a.  Improperly Named Plaintiffs, Plaintiffs Not Employed at Relevant Times, and Dues
                   Objector Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
               b. Accretion Agreement Claim Barred by the Statute of Limitations . . . . . . . . . . . . . 44
           3.    *Appropriate Sanction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## RECOMMENDATION

The Court should grant defendants' motion for summary judgment and grant in part and deny in part defendants' motion for Rule 11 sanctions.

## REPORT

### I.     Background

Plaintiffs are a group of individuals employed, or formerly employed, by Northwest Airlines as Quality Service Assistants (QSAs). Plaintiffs commenced this action on October 2, 2006, naming as defendants the International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM"); Air Transport District Lodge 143 of the IAM ("District 143"); Robert B. DePace, President and Directing General Chair of District 143; and Sandra K. Weber, General Chair and Lead Negotiator for Clerical, Office, Fleet and Passenger Service Employees of District 143. Plaintiffs allege that defendants have breached their duty of fair representation in a number of respects relating to bargaining on behalf of the QSA employees (Count I) and in handling QSA employee requests for objector status (Count II).

The matter is currently before the Court on two motions filed by defendants. On February 1, 2008, defendants filed a motion for summary judgment. Defendants argue that they are entitled to summary judgment because: (1) the claims raised in Count I of the complaint are time-barred; (2) the claims raised in Count I fail as a matter of law; and (3) the claims raised in Count II fail as a matter of law and are now moot. Defendants also argue that, with respect to 19 of the plaintiffs, they are entitled to summary judgment based on those plaintiffs' failures to respond to requests for admissions. Plaintiffs' filed a response to defendants' motion on March 25, 2008. They argue that their claims are timely and sufficient to withstand summary judgment. Defendants filed a reply on

April 3, 2008.

Second, on February 1, 2008, defendants filed a motion for Rule 11 sanctions.  Defendants argue that counsel for plaintiffs failed to conduct an adequate investigation into the law and facts prior to filing this action because: (1) it is clear that the claims are untimely; (2) several plaintiffs were not employed as QSAs at all or during the time periods relevant to the claims in the action; and (3) several plaintiffs admitted that they never made a request for objector status or were not union members in good standing at the time they requested objector status.  Plaintiffs filed a response to the motion on March 25, 2008, and defendants filed a reply on April 3, 2008.

Viewed in the light most favorable to plaintiffs, the evidence submitted by the parties sets forth the following facts.  Defendant IAM is a labor organization representing approximately 730,000 members in an array of industries.  *See* Def.s' Br., Ex. A, Decl. of Stephen Gordon, ¶ 2 [hereinafter "Gordon Decl."].  District 143 is an intermediate body within the IAM.  *See* Gordon Decl., ¶ 3.  District 143 is the bargaining unit for various classes of employees of Northwest Airlines ("NWA"), including Clerical, Office, Fleet and Passenger Service ("COFPS") employees.  *See* Gordon Decl., ¶ 3.  The collective bargaining relationship is governed by the Railway Labor Act ("RLA").  Defendant DePace was the President/Directing General Chairperson of District 143 from 1999 through October 2006.  *See* Def.s' Br., Ex. G, Dep. Tr. of Robert B. DePace, at 10 [hereinafter "DePace Dep."].  Defendant Weber was the District 143 General Chairperson during the same time period.  *See* Def.s' Br., Ex. Y, Dep. Tr. of Sandra K. Weber, at 6-7 [hereinafter "Weber Dep."]

NWA created the QSA position in 1984.  *See* Compl., ¶ 13.  QSAs perform a variety of passenger service functions at NWA terminals.  *See* Def.s' Br., Ex. H, Dep. Tr. of Lana Dowdy, at 28 [hereinafter "Dowdy Dep."].  As initially created, QSA employees were non-unionized, at will

employees. Compensation levels were therefore set by NWA, and varied from airport to airport and among employees at the same airport. *See* Def.s' Br., Ex. C, Decl. of Thomas R. Roth, ¶ 18 [hereinafter "Roth Decl."]; Ex. Q, Dep. Tr. of Patricia Merritt, at 60-61 [hereinafter "Merritt Dep."]; Ex. V, Dep. Tr. of Julie Hagen Showers, at 26 [hereinafter "Showers Dep."]; Dowdy Dep., at 29. Most QSAs were part-time employees. *See* Pl.s' Br., Ex. B; Def.s' Br., Ex. B, Decl. of Elizabeth A. Roma, Ex. 1 at 311 [hereinafter "Roma Decl."].

In 1999, the IAM began an effort to unionize QSA employees. *See* Def.s' Br., Ex. U, Dep. Tr. of Marvin Sandrin, at 5-6 [hereinafter "Sandrin Dep."]. At that time, QSAs were paid a flat hourly rate starting at $7.25 per hour, and could earn merit increases up to $10.50 per hour. QSAs also were provided F-3 travel pass privileges, the same level provided to NWA management. *See* Roma Decl., Ex. 1. Also at that time, QSAs participated in NWA's health care plan with no cost for single coverage, and could receive spousal and dependent coverage. *See* Pl.s' Br., Ex. C, Dep. Tr. of Cherie Brickey, at 39-40 [hereinafter "Brickey Dep."]. The organizing effort was led by IAM Grand Lodge Representative Marvin Sandrin, who sent a letter to the QSAs which included an authorization card to be used to obtain an representation election. The letter assured the QSAs that they would not pay any dues until they approved a contract. *See* Pl.s' Br., Ex. D. Plaintiffs claim that several IAM representatives informed QSAs that if they did not join the IAM, they would lose their jobs. *See* Pl.s' Br., Ex. E, Dowdy Dep., at 34. After collecting sufficient signatures, the IAM applied to the National Mediation Board ("NMB")–the agency tasked with determining representation disputes under the RLA, *see* 45 U.S.C. § 152–for certification as the collective bargaining representative for QSA employees. The IAM also sought accretion of the QSA employees into the existing certification for the COFPS class of employees. *See* DePace Dep., at

27-29. NWA opposed accretion. *See* Compl., ¶ 11. On April 4, 2000, the NMB issued a decision finding that the QSA employees should be accreted into the COFPS class. *See* Roma Decl., Ex. 1. Because the QSA employees were accreted into an existing class, the NMB did not conduct a representation election. *See* Roma Decl., Ex. 1, at 314.

Following the NMB's decision, defendant DePace requested that the parties meet to negotiate an interim collective bargaining agreement ("CBA") for the QSA employees. *See* DePace Dep., at 34. Because the CBA governing COFPS employees was not open for renegotiation until February 2003, DePace sought an addendum to the existing agreement to cover QSA employees. Also involved in the negotiations were Sandrin and General Chairman Gerry Bernson. *See* DePace Dep., at 36-40. On July 8, 2000, prior to the start of the negotiations, a group of 84 QSAs sent a letter to DePace complaining that the union had "expressed a blatant disregard for our opinions both in forcing us into the union . . . and in how we are to be accreted into the COFPS agreement." The letter also criticized the IAM for negotiating without QSA input, and stated that the QSAs "expect to be heard. We insist upon it . . . . [W]ithout our full input, the IAM would not be representing or negotiating on behalf of the QSAs." Pl.s' Br., Ex. F. On August 11, 2000, DePace issued a bulletin informing the QSAs that negotiations had begun and indicating that the negotiated addendum to the IAM-UAM agreement would "guarantee the benefits you currently receive." The bulletin also stated that the "accretion agreement is a temporary agreement. There will be no vote. This accretion agreement is just a vehicle to get us to the end of the COFPS agreement. That is when contract proposals are accepted and the membership votes on the contract." Pl.s' Br., Ex. G. Donna Johnson, a Minneapolis-based QSA, distributed a flyer critical of the IAM and the negotiating process. *See* Pl.s' Br., Ex. J. On August 25, 2000, DePace sent a letter to the QSAs stating that

there were "anti-union QSAs out there who have been spreading rumors of mistrust and lies." Pl.s'

Br., Ex. I; *see also*, Pl.s' Br., Ex. G, DePace Dep., at 65. The letter also indicated that the QSAs

would not be permitted to elect a negotiator for the accretion agreement negotiations, but would be

able to elect a negotiator for the new round of bargaining following the expiration of the existing

COFPS agreement. *See* Pl.'s Br., Ex. I. On October 24, 2000, District 143 and NWA entered into

a letter agreement relating to QSA employees, referred to by the parties as the "Accretion

Agreement." *See* DePace Dep., at 34-35 & Ex. 2. The Accretion Agreement provided, *inter alia*,

for formal recognition by NWA of IAM as the certified representative of QSA employees;

percentage pay increases consistent with other COFPS employees; accrual of vacation for part-time

QSAs; seniority based bidding on schedules; just cause protection against discharge; overtime pay;

preservation of QSAs' manager-level passes for travel on NWA flights until the expiration of the

existing CBA; and application of the COFPS Agreement union security provision, which required

QSAs to become members of the IAM as a condition of employment. The Accretion Agreement

did not, however, negotiate a definition of seniority, and provided that QSA travel passes would be

downgraded to level F5 after February 25, 2003 (the expiration of the then-existing collective

bargaining agreement). The Accretion Agreement also provided that all other aspects of QSA

employment would be handled consistent with NWA's policies relating to non-contract employees

until the next collective bargaining agreement. *See* DePace Dep., Ex. 2. The IAM distributed the

Accretion Agreement to QSAs and held meetings to explain the agreement. *See* DePace Dep., Ex.

67; Gordon Decl., Ex. 3. Some QSA employees objected to being required to pay dues, and others

sought unsuccessfully to reverse the NMB's accretion decision.[1]  Arden Cody, General Chair of District Lodge 143 from 1999-2006, testified that she frequently heard complaints from QSAs concerning the Accretion Agreement, and that she relayed these complaints to DePace.  *See* Pl.s' Br., Ex. K, Dep. Tr. of Arden Cody, at 22, 24 [hereinafter "Cody Dep."].  DePace was displeased with Cody pressing arguments on behalf of the QSAs.  *See id.* at 43.

As a result of a number of internal and external factors–including the September 11th terrorist attacks, the growth of low-cost airlines, and economic conditions–the airline industry faced a steep downturn in the early 2000s.  Collectively, the major United States based carriers lost $28 billion from 2001 through 2004, and two airlines–United Airlines and US Airways–declared bankruptcy.  *See* Roma Decl., Ex. 2.  NWA itself lost $3.8 billion between 2001 and the third quarter of 2005.  *See* Roth Decl., ¶ 7.  Against this backdrop, the COFPS CBA become open for renegotiation on February 25, 2003.  The CBA governing IAM-represented Equipment Service and Stock Clerk ("ESSC") employees also become open for renegotiation.  *See* Roth Decl., ¶ 5.  Under the District 143 bylaws, members elect a negotiating committee from the classes of employees represented by the IAM, and the President/Directing General Chair serves as the chair of the negotiating committee.  *See* Gordon Decl., ¶ 4.  Defendant Weber was elected to the committee from the COFPS group, and she and General Chairman Scott Peterson were appointed as lead COFPS negotiators.  *See* Weber Dep., at 28.  Thomas Roth, a labor economist, served as a consultant to the union during negotiations.  *See* Roth Decl., ¶ 4.  After negotiations began, the IAM requested that two QSA employees serve as liaisons to assist the COFPS negotiators.  *See* Dowdy Dep., at 43;

---

[1]Because the issues relating to dues objector status are fact-specific as to each plaintiff, the evidence regarding objector status is not detailed here, but is discussed in part C.4 of this Report, *infra.*

Merritt Dep., at 54. Defendant DePace testified that he decided to appoint QSA liaisons because non had been elected as negotiators and the union desired their input in order to fully integrate the QSA employees into the COFPS agreement. *See* DePace Dep. at 70-71. Plaintiffs Merritt and Dowdy were selected as QSA liaisons. *See* Dowdy Dep., at 43; Merritt Dep., at 54. They attended some negotiating sessions and conducted meetings with fellow QSAs, *see* Dowdy Dep., at 50-56, although they were apparently excluded from other negotiating sessions, specifically those related to QSA pay, *see* Pl.s' Br., Ex. H, DePace Dep., at 72-73; Dowdy Dep., at 47, 60, 63, 94.[2] Cody testified that she argued with DePace about the lack of a bona fide QSA negotiator, but DePace rejected her arguments. *See* Cody Dep., at 40-41. The issue of QSA negotiators was solely one relevant to the union; NWA did not itself bar Merritt or Dowdy from participating in the negotiations. *See* Showers Dep., at 30-31.

On August 18, 2005, the IAM and NWA signed a tentative agreement. The agreement extended most provision of the COFPS agreement to QSAs, but specified that QSA pay rates were still to be negotiated. *See* Merritt Dep., at 78 & Ex. 3; Def.s' Br., Ex. K, Dep. Tr. of Karen Fish, at 48 [hereinafter "Fish Dep."].

On September 14, 2005, NWA filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. *See* Roth Decl., ¶ 8. At the time of NWA's filing, IAM represented 14,622 NWA employees, including 4,356 Customer Service Agents–the largest group within the COFPS class–and 307 QSAs. *See* Roth

---

[2]Plaintiff's assert that "DePace did not permit any QSAs to be elected to the negotiation team when negotiations began for the successor COFPS agreement." Pl.s' Br., at 8. However, although it is apparent that a negotiating position was not made for a QSA representative specifically, there is no evidence that DePace did anything to prevent a QSA from being elected as a COFPS representative. Rather, the evidence establishes only that the COFPS class as a whole did not elect any QSAs as a class representative for the negotiations.

Decl., ¶ 10.  One of NWA's stated goals in bankruptcy was to cut its labor costs by $873 million per year, including $190 million per year in concessions from IAM-represented employees.  *See* Roth Decl., ¶ 9.  On September 26, 2005, NWA presented to the IAM its proposal for reducing labor costs under section 1113 of the Bankruptcy Code.[3]  NWA proposed a 12.5% pay cut for most IAM-represented employees, including QSAs, as well as contract changes which would allow NWA to outsource the job responsibilities of approximately 5,000 IAM-represented workers.  *See* Roth Decl.,

---

[3]In relevant part, section 1113 provides that:

(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

11 U.S.C. § 1113(b).  The section goes on to provide that the bankruptcy court may approve a petition to reject a collective bargaining agreement if the court finds that: "(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1); (2) the authorized representative of the employees has refused to accept such proposal without good cause; and (3) the balance of the equities clearly favors rejection of such agreement."  11 U.S.C. § 1113(c).  Finally, subsection (e) provides for interim emergency relief as a supplement to the relief provided in subsections (b) and (c):

If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

11 U.S.C. § 1113(e).

¶ 11.  NWA filed its section 1113(c) petition in the bankruptcy court, and the matter was set for hearing on November 16, 2005.  *See* Roth Decl., ¶ 12.  In the interim, on November 7, 2005, NWA filed a motion for interim relief under subsection (e), requesting a 19% cut in pay for all IAM-represented employees.  *See* Roth Decl., ¶ 13.  The bankruptcy court, agreeing with NWA that the relief requested was necessary to avoid liquidation, entered an order on November 16, 2005, authorizing the 19% pay cut.  In light of this relief, NWA postponed the hearing on its § 1113(c) application until January 17, 2006.  *See* Roth Decl., ¶ 13.

The IAM and NWA continued to negotiate the matter, including an intensive negotiating session on January 9-13, 2006.  These negotiations culminated in an agreement for an overall percentage pay cut of 11.5% for IAM-represented employees.  *See* Roth Decl., ¶¶ 14-16.  Although the parties had discussed the possibility of varying the pay-cut percentage for different classes of employees, it was ultimately agreed that an across-the-board cut was most equitable.  *See* Showers Dep., at 22; DePace Dep., at 116-17, 133.  In light of this agreement, Roth and NWA finance representative Patrick Clay worked to create pay scales reflecting the pay cut, taking into account the general agreement that all employees were to have their pay cut by 11.5%.  *See* Roth Decl., ¶ 17; Showers Dep., at 21-22.  This presented a problem with respect to QSAs, however, as QSAs did not have an existing pay scale; rather, QSA pay varied widely as a result of their past status as at-will employees.  *See* Roth Decl., ¶ 18.  Because QSA pay was not based on years of service, a uniform pay scale could not be created without increasing the pay of some QSAs and decreasing the pay of others.  *See* Roth Decl., ¶ 18.  Roth and Clay therefore developed a pay scale based on the then existing state of QSA compensation.  Under this scale, the pay rate of each QSA was reduced by 11.5%, and then the employees were placed on a progressive pay scale at the next level up on the

scale.  *See* Roth Decl., ¶ 19.  According to defendant, this resulted in QSAs receiving an average pay cut of only 8.9%.  *See* Roth Decl., ¶ 20; Showers Dep., at 38.

Although DePace and Showers were the lead negotiators for the parties, the pay scales were developed solely by Roth and Clay, and then reviewed by Showers and DePace before being presented to the IAM membership.  *See* Showers Dep., at 20-21.  Showers testified that as long as the $190 million reduction in labor expenses was realized, NWA did "not care how [the union] met the target."  *Id.* at 22.  NWA did not during the negotiations take the position that no employee could receive a pay raise under the contract.  *See id.* at 23-24.  Showers further testified that although she would have had some concern about the "equitable aspects" of such an outcome, the IAM could have proposed a pay scale that resulted in some employees receiving a raise so long as the $190 million target was met.  Such a result would not have been contrary to NWA's bargaining objectives.  *See id.* at 25, 51-52.  Plaintiffs contend, and the testimony of Showers and DePace supports to some extent, that the pay scales developed by Roth and Clay are contrary to the actual language of the COFPS agreement and the historical practice of slotting employees in a pay scale.  *See id.* at 44; DePace Dep., at 123-24, 154; Weber Dep., at 86.  DePace also testified that the pay scale issue could have been taken back to NWA, and that the issue could have been resolved by taking the raise that a small number of QSAs would have received under the traditional seniority-based pay scaling and spreading it over the 14,000 IAM members.  *See* DePace Dep., at 115-16, 133.

Although the IAM and NWA did not reach agreement on other matters, the IAM agreed to present NWA's last best offer on the pay reduction to the union membership for vote.  NWA's last best offer also included the August 18, 2005, tentative agreement regarding QSAs.  *See* Roth Decl., ¶ 21; Merritt Dep., at 89-90.  On January 19, 2006, the IAM posted NWA's proposed Bankruptcy

Agreement on the Internet. The IAM also mailed the proposed agreement to members. After seeing the proposed agreement, a number of QSAs apparently believed that they would be placed on the pay scale according to years of service. *See* Def.s' Br., Ex. Z, Dep. Tr. of Kim Zitzloff, at 26 [hereinafter "Zitzloff Dep."]. On February 1, 2006, NWA labor relations officer David Driscoll issued an e-mail addressing the QSA pay scale. *See* Compl., ¶ 26; Def.s' Br., Ex. O, Dep. Tr. of Mary Lou Ketland, at 20-23 & Ex. 5 [hereinafter "Ketland Dep."]. The e-mail indicated that "[a]ll QSAs would be subject to the same 11.5% pay cut applicable to all IAM employees," and further stated: "It **IS NOT**

the case (as apparently many QSAs believe) that an 8-year QSA who is currently making $8.00/hr. will go, on the date of signing, to the 8th year pay step ($11.00) and, in effect receive a 35% raise." The e-mail explained that all QSA salaries would be cut by 11.5%, and then each QSA would be placed on the pay scale reflective of that pay rate, regardless of the QSA's actual years of service. *See* Ketland Dep., Ex. 5. The Driscoll e-mail was widely circulated among QSAs in Detroit, Minneapolis, and Memphis, NWA's hub cities. *See* Ketland Dep., at 20-22 & Ex. 5; Merritt Dep., at 99-101; Weber Dep., at 60; Zitzloff Dep. at 25-26. The circulation in Memphis and Detroit occurred on February 2, 2006, the day prior to the ratification vote in Detroit. On February 6, 2006, Minneapolis-based QSAs Kim Zitzloff and Karen Fish met with defendant Weber regarding the pay scale. Weber told them that she had spoken with Roth, who explained that his understanding of the pay scale was the same as Driscoll's understanding. Weber also indicated that DePace had spoke with Driscoll, and that Driscoll had again explained to DePace that every employee was going to be subject to an 11.5% pay cut. *See* Zitzloff Dep., at 34; Fish Dep., at 62-63 & Ex. 6. Zitzloff and Fish distributed the memorandum regarding their meeting with Weber to fellow Minneapolis-based

QSAs prior to the ratification vote at that location. *See* Zitzloff Dep., at 40-41.

Plaintiffs contend that after the COFPS letter of agreement was signed several IAM officials, including defendant Weber, expressed their opinions that the union had mistreated the QSAs. *See* Cody Dep., at 52-53; Dowdy Dep., at 111; Sandrin Dep., at 24-25; Pl.'s Br., Ex. V. On March 7, 2006, the IAM announced that the COFPS membership had ratified the Bankruptcy Agreement by a vote of 67% to 33%. *See* Compl., ¶ 24. A number of QSAs subsequently requested dues objector status.

Gordon was elected President/Directing General Chair of District Lodge 143 in June 2006. In August, Gordon met with several QSAs and their counsel regarding their concerns. *See* Gordon Dep., at 28-29. Gordon told the QSAs that he would meet with NWA management once he took office to discuss the issues raised by the QSAs, but did not do so after he took office on October 1, 2006. *See id*. at 39-40. Gordon testified that he believes the QSAs are being paid properly under the Bankruptcy Agreement, and that he has not investigated whether the pay scale issue presents a grievable issue that could submitted to arbitration. *See id*. at 93, 117-18.

In addition to this time line of specific events, plaintiffs have presented evidence of animosity between DePace and other IAM officials and the QSA employees. According to Cody, DePace was frustrated with QSA complaints, and stated that the QSAs were "trouble." *See* Cody Dep., at 25. DePace also told Cody that he wished the IAM had never accreted the QSAs, and that he could "give them back" to NWA. *See id*. at 26. DePace also referred to the QSAs as a bunch of "whiners." *See id*. at 36. On December 11, 2006, plaintiff Merritt sent a letter to IAM President R. Thomas Buffenbarger stating that Secretary-Treasurer Tareia Harris refused to let QSAs pay past dues at a December 2006 meeting in order to be eligible to vote in officer elections, even though she

had taken steps to make sure that employees besides QSAs could pay past dues so they could vote. *See* Pl.s' Br., Ex. L. QSA Mary Buckley testified that she contacted General Chair Bill Holloway in Memphis to inquire about the status of a grievance she had filed, but that Holloway had told her he was too busy to look into "QSA problems." Holloway did not again contact Buckley concerning the grievance. *See* Pl.s' Br., Ex. N, Dep. Tr. of Mary Buckley, at 47-49. QSA Elizabeth Fawaz testified that at a union meeting in 2006 she attempted to discuss some complaints they had with the union, but were told by union leadership at the meeting that "QSA business would not be discussed." *See* Pl.s' Br., Ex. O, Dep. Tr. of Elizabeth Fawaz, at 9. Memphis-based QSA Cherie Brickey testified that she filed grievances in 2000 and 2006, but that the grievances were not addressed by the union , and that the IAM "never took the QSAs seriously." Brickey Dep., at 29-30, 56.

Plaintiffs commenced this action on October 2, 2006. Plaintiffs are 179 individually named current or former QSA employees. *See* Compl., Ex. A. In Count I of their complaint, plaintiffs allege that defendants violated their duty of fair representation in connection with the negotiation and implementation of the various agreements which affect the QSA terms of employment. In Count II of their complaint, plaintiffs allege that defendants violated their duty of fair representation by failing to properly honor plaintiffs' requests for dues objector status.

## II.     Defendants' Motion for Summary Judgment

Defendants move for summary judgment with respect to both Counts of the complaint, on a number of bases. With respect to Count I, defendants argue that plaintiffs' duty of fair representation claims are barred by the statute of limitations, and that the claims fail as a matter of law on the merits. With respect to Count II, defendants argue that plaintiff's claims are without merit, and that the claims are moot in light of the IAM's offer to afford retroactive dues objector

status to plaintiffs who make a proper request. Finally, in addition to these arguments, defendants argue that they are entitled to summary judgment with respect to the claims of 19 plaintiffs who failed to respond to their requests for admissions.

A.      *Summary Judgment Standard*

Under Rule 56, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick*, 355 F.3d at 451-52 (citing *Anderson*, 477 U.S. at 248). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick*, 355 F.3d at 451 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. "Once the moving party satisfies its burden, 'the burden shifts to the

nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also*, FED. R. CIV. P. 56(e).

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue. As the Supreme Court has explained: "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland*, 344 F.3d at 613.

B.    *Timeliness of Plaintiffs' Claims*

Defendants first argue that plaintiffs' claims are untimely. The Court should agree, and should grant defendants' motion for summary judgment on this basis.

1.    *The Limitations Period Generally*

Plaintiffs' duty of fair representation (DFR) claims are brought pursuant to the Railway Labor Act, 45 U.S.C. §§ 151-188, which governs labor issues involving air carriers. *See* 45 U.S.C. § 181. The RLA does not itself impose a duty of fair representation on labor organizations, but the Supreme Court implied such a duty in *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 202-03 (1944). The Court later implied such a duty with respect to labor organizations governed by the National Labor Relations Act and the Labor-Management Relations Act, noting the similarities between the

Acts and the RLA. *See Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164 n.14 (1983). Because neither the NLRA nor the RLA provide an explicit cause of action for breach of the duty of fair representation, neither act likewise explicitly provides a limitation period for such claims. Noting the need for federal uniformity in the area of labor relations, and noting the similarities between DFR actions under the NLRA (and hybrid DFR/employment contract claims under the LMRA) and unfair labor practice actions under § 10(b) of the NLRA, 29 U.S.C. § 160(b), the *Del Costello* Court adopted the six-month limitation period set forth in § 10(b) of the NLRA as the limitation period governing DFR claims under the LMRA. *See Del Costello*, 462 U.S. at 169-71. The courts of appeals have uniformly concluded that the reasoning of *Del Costello* applies equally to DFR claims under the RLA, and that a six month limitation period therefore governs DFR claims brought under the Act. *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 304 (3d Cir. 2004); *Spaulding v. United Transp. Union*, 279 F.3d 901, 908 (10th Cir. 2002); *Landry v. Air Line Pilots Ass'n*, 901 F.2d 404, 410-14 (5th Cir. 1990); *Welyczko v. U.S. Air, Inc.*, 733 F.2d 239, 240 (2d Cir. 1984). The Sixth Circuit has likewise reached this conclusion. *See Ratkosky v. United Transp. Union*, 843 F.2d 869, 873 (6th Cir. 1988).

"As a general rule, the limitations period begins to run when the potential plaintiff knows or should have known of the union's alleged breach of its duty of fair representation." *Ratkosky*, 843 F.2d at 873; *see also*, *Schoonover v. Consolidated Freightways Corp.*, 49 F.3d 219, 221 (6th Cir. 1995). In general, with respect to DFR claims based on a contract, the plaintiff knows or should know of the union's breach, and thus the limitation period begins to run, on the date that the contract is signed or ratified. *See Spaulding*, 279 F.3d at 908; *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1106 (2d Cir. 1991); *United Independent Flight Officers v. United Air Lines, Inc.*, 756

F.2d 1262, 1273 (7th Cir. 1985).

2.   *Analysis*

Plaintiffs' complaint was filed on October 2, 2006. Thus, under the six-month limitation period any claims which accrued prior to April 2, 2006, are untimely.

### a. Claims Relating to Bankruptcy Agreement

With respect to plaintiff's claims related to the Bankruptcy Agreement, at first glance these claims appear to be barred by the six-month limitation period. It is undisputed that the COFPS letter of agreement negotiated in the bankruptcy context was ratified by the COFPS membership no later than March 7, 2006. *See* Compl., ¶ 24. Under the general rule noted above, plaintiffs' claims relating to that agreement accrued upon ratification, and thus the claims are untimely. Plaintiffs, however, press two arguments to the contrary.

First, plaintiffs argue that their claims based on the Bankruptcy Agreement did not accrue until that agreement was approved by the bankruptcy court, which occurred on August 1, 2006. The Court should disagree. In the first place, it is not clear that approval of the bankruptcy court was even a condition necessary to the execution of the contract. Certainly nothing in § 1113 required bankruptcy approval. In its entirety, § 1113 provides:

> (a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
> (b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall–
> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit

the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that–

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee.

The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1113. By its terms, section 1113 merely requires bankruptcy approval before a debtor may *unilaterally* reject a collective bargaining agreement. The statute itself contemplates a negotiated settlement which would not require the involvement of the bankruptcy court, as it requires a debtor to first negotiate in good faith with the collective bargaining representative. Thus, "[t]he plain language of § 1113 . . . make[s] clear that these provisions are inapplicable where union . . . representatives agree to a debtor's proposal." *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 n.8 (3d Cir. 2006).

It is true, as plaintiffs suggest, that at the point the Bankruptcy Agreement was executed NWA's previously filed "application under section 1113 to reject the agreement entered a state of suspended animation," *In re UAL Corp.*, 443 F.3d 565, 568 (7th Cir. 2006), but this does not mean that the Agreement itself was without any effect. On the contrary, in the absence of any requirement for court approval, plaintiff offers no reason to conclude that the Agreement was not effective upon its execution and ratification. As noted above, nothing in § 1113 required court approval for the parties to mutual agree to the newly negotiated CBA. Plaintiffs point to no case law nor provision of the Bankruptcy Code requiring such approval. Section 363, which is not cited by plaintiffs, does require approval for certain transactions outside the ordinary course of approval. *See* 11 U.S.C. § 363(b), (c). However, the Bankruptcy Agreement was the culmination of the parties' negotiations for a new CBA to replace the agreement that had expired in 2003. As such it was a contract entered into in the normal course of business for which approval was not required under § 363. *See In re*

*Hillard Dev. Corp.*, No. 90-27588, 2004 WL 1347049, at *1 (Bankr. S.D. Fla. Apr. 16, 2004); *In re Illinois-California Express, Inc.*, 72 B.R. 987, 991-92 (D. Colo. 1987); *In re DeLuca Distrib. Co.*, 38 B.R. 588, 592-94 (Bankr. N.D. Ohio 1984).[4]

In any event, plaintiffs have offered no case law to support their claim that, even if court approval was required, the limitations period commenced any later than the execution and ratification of the Agreement. Assuming that court approval was required, this requirement is nothing more than a condition precedent. And plaintiffs have cited to no case suggesting that the existence of condition precedent alters the ordinary rule of accrual for DFR claims. As noted above, the consistent rule applied by the courts is that a DFR claim accrues "when the potential plaintiff knows or should have known of the union's alleged breach of its duty of fair representation." *Ratkosky*, 843 F.2d at 873. In the case of DFR claims based on collective bargaining, this occurs when the CBA is executed. Notably, it is irrelevant whether plaintiffs knew the precise effects of the CBA, *see Propst v. Association of Flight Attendants*, 546 F. Supp. 14, 21 (E.D.N.Y. 2008), or had begun to feel those effects, *see Clift v. International Union, United Automobile, Aerospace & Agricul. Implement Workers of Am.*, 818 F. 2d 623, 629 (7th Cir. 1987) ("The claim does not wait to accrue until the time at which the contested provisions of the agreement are enforced."), *vacated on other grounds*, 488 U.S. 1025 (1989). Here, there is no dispute that plaintiffs knew of the union's resolution of the seniority scale issue at the time the Bankruptcy Agreement was ratified, or that this agreement itself constitutes the actionable breach of the union's duty of fair representation.

---

[4]As one court has explained, the execution of a new CBA is outside the ordinary course of business and requires approval under § 363 only if the CBA provides "something extraordinary, such as giving the union a lien on the debtor's property . . . ." *In re Leslie Fay Cos., Inc.*, 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994). However, "[i]f the scope of the agreement is consonent with its predecessors and does not offend any fundamental bankruptcy policy, the debtor does not need to provide notice and a hearing" or obtain court approval. *Id.*

Accordingly, the claim accrued and the six month limitation period begun to run when the agreement was ratified.[5]

Plaintiffs also claim that their claims relating to the bankruptcy agreement are timely under the so-called "rays of hope" doctrine. Under this doctrine, as explained by the Third Circuit, where a "union purports to continue to represent an employee in pursuing relief, the employee's duty of fair representation claim against the union will not accrue so long as the union proffers 'rays of hope' that the union can 'remedy the cause of the employee's dissatisfaction.'" *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 305 (3d Cir. 2004) (quoting *Childs v. Pennsylvania Fed'n Brotherhood of Maintenance Way Employees*, 831 F.2d 429, 434 (3d Cir. 1987)). Plaintiffs argue that the rays of hope doctrine is applicable here for two reasons. First, in the June 30, 2006, edition of the IAM's newsletter, defendant Weber wrote that she and DePace had met with NWA in an effort to rectify the "big injustice to the QSAs in their pay scale." Pl.s' Br., Ex. V. Second, Gordon met with several QSAs and their counsel in August 2006, at which time he indicated that he would pursue the QSAs' issues with NWA management once he took office as President in October 2006. *See* Gordon Dep., at 28-29, 39-40.

The problem with plaintiffs' argument, however, is that the "rays of hope" doctrine is confined to the Third Circuit. No court outside that circuit has adopted the doctrine, at least as stated by the Third Circuit in *Bensel*. On the contrary the Sixth Circuit, along with the other circuits that have considered the matter, have held that while the limitations period may be tolled while a

---

[5]For the same reasons, plaintiff's argument that the claims did not accrue because the Agreement was not effective until NWA had negotiated CBAs with other bargaining units is without merit. As with the assumed requirement of bankruptcy court approval, the successful negotiation of CBAs with other bargaining units simply constitutes a condition precedent which does not affect the accrual of plaintiffs' claims.

potential plaintiff pursues formal contractual grievance procedures, the period is not tolled by informal attempts to resolve an issue or by general promises by union officials to resolve the issue. *See Long v. General Motors Corp.*, 19 Fed. Appx. 200, 202-03 (6th Cir. 2001); *Darden v. Local 247, International Brotherhood of Teamsters*, No. 95-1453, 1996 WL 692095, at *2 (6th Cir. Nov. 26, 1996); *Adkins v. United Mine Workers of Am.*, No. 93-6386, 1995 WL 441630, at *4-*5 (6th Cir. July 25, 1995); *see also*, *Myers v. Southern Cal. Gas Co.*, No. 98-56599, 2000 WL 831812, at *1 (9th Cir. June 27, 2000); *Spaulding*, 279 F.3d at 911; *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 916 (7th Cir. 1999); *Follin v. Safeway, Inc.*, No. 97-2398, 1998 WL 808374, at *2 (4th Cir. Nov. 23, 1998). Here, there is no evidence that plaintiffs pursued any formal contractual remedies within the limitations period so as to toll their claims, and defendants' alleged assurances that they were working on the issue are insufficient to toll the limitations period. *See Long*, 19 Fed. Appx. at 202.

For these reasons, the Court should conclude that plaintiffs' claims relating to the Bankruptcy Agreement are barred by the sixth month limitations period applicable to DFR claims. Accordingly, the Court should grant defendants' motion for summary judgment with respect to those claims.

### b. Claims Relating to Accretion Agreement

With respect to plaintiff's claims based upon the negotiation of the 2000 Accretion Agreement, the claims are untimely. The accretion agreement was executed on October 24, 2000, nearly six years prior to the commencement of this action. Under the general rule noted above, plaintiffs' claims with respect to the Accretion Agreement accrued on the date the agreement was executed, and the limitation period with respect to any claims based on the Accretion Agreement

therefore commenced on October 24, 2000.  Plaintiffs claim that any claims based on the Accretion

Agreement are timely because that agreement was a temporary, interim measure, and that the effect

of their DFR claim "accrued and could only accrue when Northwest Airlines actually implemented

the contractual agreement negotiated by the IAM and Northwest Airlines on August 1, 2006."  Pl.s'

Br., at 26-27.  It is not clear, however, why the Accretion Agreement should be tied to the

Bankruptcy Agreement in this manner.  Plaintiffs suggest that "[t]here was no contract provision that

applied the non-seniority based pay scale to the QSAs until Northwest implemented the Bankruptcy

Court approved Letter of Agreement."  *Id*. at 26.  This is true, but irrelevant.  Whatever claims

plaintiff may have arising from the Accretion Agreement, they certainly do not include the pay scale

issue which was not at all a part of the Accretion Agreement.  Plaintiffs offer no argument as to the

connection between the issues addressed by the Accretion Agreement and the Bankruptcy

Agreement, nor do they offer anything to suggest that they were not well aware of any breaches of

the union's duty of fair representation in connection with the Accretion Agreement.  On the contrary,

by their own accounts plaintiffs immediately and repeatedly complained about the terms of the

Accretion Agreement after its execution.  And, in any event, tying the Accretion Agreement claims

to the Bankruptcy Agreement claims does not aid plaintiffs, because as discussed above the

Bankruptcy Agreement claims are themselves untimely.  Accordingly, the Court should conclude

that plaintiffs' claims relating to the Accretion Agreement are untimely, and that defendants are

entitled to summary judgment with respect to these claims.

C.      *Duty of Fair Representation*

        Defendants next argue that, regardless of whether plaintiff's DFR claims are timely, they are

without merit.  In the event that the Court disagrees with my recommendation regarding the statute

of limitations, the Court should nevertheless grant defendants' motion for summary judgment on this alternative ground.

1.    *Duty of Fair Representation Generally*

As noted above, the RLA does not explicitly impose on unions a duty of fairly representing its members. However, as the Supreme Court has held with respect to both the RLA and the NLRA, "[w]hen a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status . . . as the exclusive representative of the employees in the unit, to represent all members fairly." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998); *see Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 202-03 (1944). Thus, "a union must represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements." *International Brotherhood of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979). In other words, "the duty of fair representation requires a union 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Marquez*, 525 U.S. at 44 (quoting *Vaca v. Spikes*, 386 U.S. 171, 177 (1967)).

"[A] union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez*, 525 U.S. at 44; *accord Foust*, 442 U.S. at 47; *Vaca*, 386 U.S. at 190. "This is a tripartite standard; a court should look to each element when determining whether a union violated its duty." *Griffin v. Air Line Pilots Ass'n*, 32 F.3d 1079, 1083 (7th Cir. 1994); *see also*, *Marquez*, 525 U.S. at 44; *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 76-77 (1991). "Therefore, the three separate levels of inquiry under this standard are as follows: (1) did the union act arbitrarily; (2) did the union act discriminatorily; or (3) did the

union act in bad faith." *Griffin*, 32 F.3d at 1083 (internal quotation omitted); *see also*, *Morales-Vallellanes v. Potter*, 339 F.3d 9, 16 (1st Cir. 2003). Thus, "[i]n order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to record evidence supporting any one or all of these elements." *Griffin*, 32 F.3d at 1083; *see also*, *Morales-Vallellanes*, 339 F.3d at 16.

With respect to the arbitrariness inquiry, the Court has explained that "Congress did not intend judicial review of a union's performance to permit the court to substitute its own views of the proper bargain for that reached by the union." *O'Neill*, 499 U.S. at 78. "Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id*. Further, "the rationality of a union's decision" must be evaluated "in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made." *Id*. "The duty of fair representation does not require that a union achieve absolute equality among its members. Rather, because a union by necessity must differentiate among its members in a variety of contexts a showing that union action has disadvantaged a group of members, without more, does not establish a breach of the duty of fair representation." *Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 221 (2d Cir. 1989) (citing *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)); *see also*, *Steele*, 323 U.S. at 203.

Finally, "[e]stablishing that the union's actions were sufficiently 'arbitrary, discriminatory or in bad faith,' is only the first step toward proving a fair representation claim. Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries." *Spellacy v. Airline Pilots Ass'n*, 156 F.3d 120, 126 (2d Cir. 1998). This generally requires a showing that,

but for the union's breach of its duty, "the company would have acceded to the union's demands." *Ackley v. Western Conference of Teamsters*, 958 F.2d 1463, 1472 (9th Cir. 1992); *see also*, *Brown v. International Union, United Automobile, Aerospace & Agric. Implement Workers of Am.*, 689 F.2d 69, 71 (6th Cir. 1982).

2.    *Analysis*

a.  *Accretion Agreement*

Other than general assertions that the union, particularly through DePace, exhibited hostility to the QSAs, plaintiffs do not raise any argument in their brief or point to any particular facts demonstrating that the union breached its duty of fair representation with respect to the negotiation of the Accretion Agreement.  Plaintiffs' brief addresses specifically only the pay scale issue arising from the Bankruptcy Agreement.  *See* Pl.s' Br., at 27-31.

In any event, there is no genuine issue of material fact to suggest that the union's negotiating decisions were arbitrary under the first prong of the tripartite standard.  With respect to the Accretion Agreement, plaintiffs essentially claim that the union should have obtained an agreement with NWA which would have provided QSAs with the same benefits provided in the then-existing COFPS agreement, most notably a seniority-based pay scale and holiday pay.  As defendants note, the existing COFPS agreement did not automatically apply to the QSAs simply by their accretion into the COFPS class, *see Association of Flight Attendants v. USAir, Inc.*, 24 F.3d 1432, 1437-38 (D.C. Cir. 1994), and the COFPS agreement itself was not amendable until its expiration on February 23, 2003.  Defendant DePace testified that NWA concluded it was not in its interest to reopen the contract and thus refused to do so, *see* DePace Dep., at 25-26, and plaintiffs have pointed to no evidence in the record to contradict this assertion.  Thus, the union had no real bargaining

leverage to use, and was left to negotiate the best deal that it could. And although the union was unable to obtain the full application of the COFPS agreement that it sought, *see* DePace Dep., at 25, the Accretion Agreement did provide several benefits to QSAs that they had not previously enjoyed, including percentage pay increases consistent with other COFPS employees; accrual of vacation for part-time QSAs; seniority based bidding on schedules; just cause protection against discharge; overtime pay; and preservation of QSAs' manager-level passes for travel on NWA flights until the expiration of the existing CBA. *See* DePace Dep., Ex. 2; *see also*, Merritt Dep., at 59-65. Plaintiffs have made no argument in their brief, much less pointed to evidence demonstrating, that the union acted arbitrarily in negotiating and executing the Accretion Agreement.

Nor have plaintiffs pointed to any evidence of bad faith or discrimination with respect to the Accretion Agreement. With respect to discrimination, the QSAs were the only ones subject to the Accretion Agreement. As noted above, the Accretion Agreement resulted in QSAs being treated differently than other members of the COFPS class, but this was only because the COFPS contract did not apply to them and because NWA refused to reopen that contract. Nor is there any evidence of bad faith in connection with the Accretion Agreement. Plaintiffs' evidence regarding the union's animus all post-dates the Accretion Agreement. Indeed, the evidence suggests only that the union officials' alleged animus arose after the accretion decision and the execution of the Accretion Agreement, and as a result of the QSAs' reaction to those decisions. Thus, even if there was animus directed toward the QSAs by union leadership at some point, there is no evidence of such animus at the time the Accretion Agreement was negotiated and executed.

In short, plaintiff's have failed to make any argument, or point the Court to any evidence, demonstrating that defendants acted arbitrarily, discriminatorily, or in bad faith in deciding to

accrete defendants to the COFPS class or in negotiating the Accretion Agreement. Accordingly, the Court should conclude that defendants are entitled to summary judgment with respect to plaintiffs' DFR claims premised on the Accretion Agreement.

### b. Bankruptcy Agreement

With respect to the union's representation of QSAs in the negotiation of the COFPS agreement after its expiration in 2003 and in the eventual negotiation and execution of the Bankruptcy Agreement, plaintiffs' claim focuses on the discrimination and bad faith prongs of the tripartite test. The Court should conclude that defendants are entitled to summary judgment on plaintiffs' DFR claims relating to the Bankruptcy Agreement. Plaintiffs argue that DePace admitted in his deposition that the pay scales applied to the QSA employees did not comport with the historical practice, and that by agreeing to the pay scales the union sacrificed the interests of the QSAs to those of the more traditional employees of the COFPS class. However, the evidence submitted does not support this argument.

It is true that the QSAs were subject to the pay scales based on their then-existing salary, rather than being put into the pay scale based solely on seniority. There is no evidence to dispute, however, that this was solely based on two factors: (1) the historical treatment of QSAs by NWA, which resulted in QSAs being compensated inconsistently and based on factors other than seniority; and (2) the union's desire to spread the entire cost of NWA's mandated cuts in personnel costs evenly across all employees in the COFPS class, and indeed across all employee classes represented by the union. *See* Showers Dep., at 22; DePace Dep., at 116-17. Based on these factors, Roth and Clay agreed to place the QSAs on the seniority scales based on their existing pay, rather than on their years of service, so that QSAs would be subject to the same 11.5% cut in pay as all other IAM-

represented employees. *See* Roth Decl., ¶ 19. Thus, in one respect the QSAs were treated differently with respect to how they were placed on the pay scales, but this was only to insure that in the end the QSAs were treated the same as all other employees.

It is true, as plaintiffs suggest, that NWA did not require the union to spread the wage concessions across-the-board (although NWA considered that to be the most equitable approach), *see* Showers Dep., at 25, 51-52, and that the union could have placed the QSAs in the pay scales based on seniority and spread the cost among the other 14,000 COFPS employees. Plaintiffs do not, however, offer anything to show that the union's decision to essentially treat all employees equally with respect to wage cuts was arbitrary or discriminatory. Rather, they argue only that the union, by essentially treating them the same as all other employees with respect to wage concessions, sacrificed their preferred interests to those of the majority of COFPS employees. However the union's reasoned decision to do so–based on the economic realities of NWA's financial condition, the inexact fit of QSAs into the existing pay scales, and the desire to spread the cost of the wage concessions evenly–does not constitute a breach of the duty of fair dealing. *See Spellacy v. Airline Pilots Ass'n*, 156 F.3d 120, 126 (2d Cir. 1998) ("[A] union's reasoned decision to support the interest of one group of employees over the competing interests of another group does not constitute arbitrary conduct."). As the Sixth Circuit has explained:

> Negotiation means compromise. Neither employees as a whole nor particular groups of employees emerge from bargaining with all their wants satisfied. Often unions can achieve more for some of their constituents only by accepting less for others. "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

*Rakestraw*, 981 F.2d at 1529-30 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953));

*see also*, *Steele*, 323 U.S. at 203.[6]

Nor is there any evidence of bad faith sufficient to withstand summary judgment. "A union acts in bad faith when it acts with an improper intent, purpose, or motive. Bad faith encompasses fraud, dishonesty, or other intentionally misleading conduct." *Spellacy*, 156 F.3d at 126; *see also*, *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S.

---

[6]Plaintiffs claim that this case is indistinguishable from *Williams v. Molpus*, 171 F.3d 360 (6th Cir. 1999), in which the Sixth Circuit reversed the district court's grant of summary judgment to the defendants on a DFR claim. The DFR claim in that case related to a merging of two seniority lists which the union chose to "endtail"–*i.e.*, placing the second company's employees at the bottom of the combined list–rather than to "dovetail" the two lists. However, there are some materially distinguishing features between this case and *Williams*. In *Williams* there was evidence that the union had misrepresented to its members that the merging companies had demanded endtailing rather than dovetailing, when it was the union itself which had sought endtailing. *See id.* at 365. Plaintiffs claim that there is similar evidence here that the union misrepresented that NWA had demanded an across-the-board pay cut when in fact NWA did not care how its labor cost reductions were met. As noted above, this is not an entirely fair characterization of the evidence. Although Showers testified that NWA's concern was with reducing labor costs however that might be achieved, she also testified that there would have been some concern on her part about the equity of allowing some employees to obtain a raise in pay while the bulk of employees faced a pay cut. In any event, the misrepresentation in *Williams* regarding who had requested the endtailing provision was accompanied by two significant facts not present here. First, the endtailing at issue in *Williams* "sacrific[ed] the seniority status of over 200 Complete employees in order to benefit nine TSI employees." *Id.* at 366. Here, the contrary is true: the union refused to sacrifice the interests of the vast majority of its members to accommodate the demands of a small group of QSAs. Second, there was evidence that the endtailing was designed by the responsible union official solely to benefit that official's son, whose job may have been in jeopardy had the seniority lists been dovetailed rather than endtailed. *See id.* at 365. There is no comparable suggestion in this case.

Plaintiffs also point to the *Williams* court's reliance on the fact that endtailing rather than dovetailing the seniority lists was contrary to the normal practice, arguing that such is the case here. Again, however, the circumstances of the case are different. Based on NWA's past treatment of QSAs regarding their pay, the QSAs did not fit neatly within any traditional framework of seniority. And, unlike in *Williams*, there were economic factors which required the union to accept significant wage concessions for all COFPS employees. It was not arbitrary for the union to conclude that the traditional approach did not work in these circumstances, and that the most equitable result for its membership was to spread the cost of the wage concessions equally among all represented employees. Thus, the Court should conclude that *Williams* does not alter the conclusion reached above.

31

274, 299 (1971) (internal quotation omitted) ("There must be substantial evidence of fraud, deceitful action or dishonest conduct."); *Mock v. T. G. & Y. Stores Co.*, 971 F.2d 522, 531 (10th Cir. 1992). Thus, plaintiffs must point to "serious misrepresentations that lack rational justification or are improperly motivated." *Alicea v. Suffield Poultry, Inc.*, 902 F.2d 125, 130 (1990). Plaintiffs point to no such evidence. Although they point to evidence demonstrating that DePace and other union officials may have harbored animus against them in general, they do not identify any fraud, dishonesty, or intentionally misleading conduct on the part of defendants. On the contrary, the record is replete with evidence that union officials at all times were forthright about the operation of the pay scales with respect to the QSA employees, repeatedly correcting the employees' perceptions regarding the operation of the pay scales. *See* Compl., ¶ 26; Ketland Dep., at 20-23 & Ex. 5; Merritt Dep., at 99-101; Weber Dep., at 60; Zitzloff Dep., at 25-26, 34, 40-41; Fish Dep., at 62-63 & Ex. 6. Further, even assuming that DePace and other officials had a "bad" motive, "a 'bad' motive does not spoil a collective bargaining agreement that rationally serves the interests of workers as a whole, and that treats employees who are pariahs in the union's eyes no worse than it treats similarly situated supporters of the union." *Rakestraw*, 981 F.2d at 1535. Here, as explained above, the Bankruptcy Agreement and the pay scales adopted pursuant to that agreement treated QSAs the same as other COFPS employees with respect to the wage concessions demanded by NWA. Thus, even assuming a bad motive on the part of the union officials, plaintiffs cannot establish that the union breached its duty of fair representation.

"In sum, there is no possible inference that the plaintiffs were unfairly singled out, which is the gist of their entire claim. The union simply allowed their interest to be overridden to advance the will of the majority: it is the nature of any union that the majority can prevail against the minority.

This may be distasteful, especially . . . where the minority has a sympathetic position. But it cannot be described as arbitrary, discriminatory or in bad faith. If it could, virtually every union decision-which, assuming dissent, always entails the majority's success against a minority-could be construed as a breach of duty of fair representation claim." *Griffin*, 32 F.3d at 1083 (citing *Rakestraw*, 981 F.2d at 1529-37). Accordingly, the Court should conclude that defendants are entitled to summary judgment on plaintiffs' DFR claims relating to both the Accretion Agreement and the Bankruptcy Agreement.

### c. *Plaintiffs Who Failed to Respond to Requests for Admission*

Even if the Court disagrees with my above conclusions that plaintiffs' claims are untimely and fail as a matter of law under Rule 56, the Court should nevertheless grant summary judgment with respect to 19 plaintiffs who failed to respond to defendants' requests for admission. The 19 plaintiffs identified as having failed to respond are: Masumi Abeler, Mike Barlow, Laverne Bobbitt, Ronald Box, Shelly Courtney, Alex Curque, Michelle Dandin, Assad Fawaz, Jean Guerin, Richard Ketland, Theresa Lesher, Teresa Peck, Amy Perkins, Joan Poole, Susan Priebe, Marla Rabisha, Sherry Sandey, Diane Waterston, and Joyce Wilmes. *See* Roma Decl., ¶ 15. Plaintiffs in their brief do not dispute that these individual plaintiffs failed to respond to defendants' requests for admissions. The requests for admission asked plaintiffs to admit, *inter alia*, that they had never worked as QSAs and that they have no evidence that defendants acted arbitrarily, discriminatorily, or in bad faith. *See* Roma Decl, Ex. 5, Request Nos. 1, 21-23.

Pursuant to Rule 36(b), a request for admission which is not responded to within the applicable time period is deemed conclusively established. *See Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 153 (6th Cir. 1997); FED. R. CIV. P. 36(b). Such "matters deemed admitted . . . can

serve as a basis for the granting of a motion for summary judgment." *Turk v. CitiMortgage*, No. 05-70386, 2005 WL 2090888, at *3 (E.D. Mich. Aug. 29, 2005) (Duggan, J.) (citing *Dukes v. South Carolina Ins. Co.*, 770 F.2ed 545, 548-49 (5th Cir. 1985); *First Nat'l Bank Co. of Clinton, Ill. v. Insurance Co. of N. Am.*, 606 F.2d 760, 766 (7th Cir. 1979); FED. R. CIV. P. 56(c)). The failure of the 19 plaintiffs to respond therefore conclusively establishes that they were not employed as QSAs and have no evidence that defendants acted arbitrarily, discriminatorily, or in bad faith. Thus, even assuming plaintiffs' claims otherwise withstand summary judgment, the Court should conclude that defendants are entitled to summary judgment with respect to these 19 plaintiffs.

### 4. *Objector Status Claims*

Plaintiffs allege in Count II that the union violated its duty of fair representation by failing to grant dues objector status to them upon their request. Defendant argues that these claims are moot in light of the union's offer to plaintiff's counsel that it would grant objector status retroactive to March 2006 for those plaintiff who make proper requests for objector status. Alternatively, defendants argue that they are entitled to summary judgment because there is no evidence that any plaintiff properly requested dues objector status in accordance with the union's rules.

### a. *Mootness*

The Court should first conclude that plaintiffs' claims relating to the dues objector status are not moot. As the Supreme Court has explained:

> Simply stated, a case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. We recognize that, as a general rule, voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. But jurisdiction, properly acquired, may abate if the case becomes moot because
> (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and,

34

(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.

The burden of demonstrating mootness "is a heavy one."

*County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citations and internal quotations omitted).

Here, defendants have not met their "heavy" burden of demonstrating mootness. It is true that the granting of retroactive objector status may obviate the harm resulting from the initial denial of such status. However, defendants' offer is premised upon plaintiffs' filing proper dues objector requests, and plaintiffs contend that the union's requirements for dues objector requests are themselves improper. Thus, the controversy between the parties remains "live" despite the union's offer.

### b. Merits of the Claims

Turning to the merits of plaintiffs' dues objector claims, the Court should conclude that defendants are entitled to summary judgment. In a line of cases, the Supreme Court has interpreted the RLA's provision allowing for closed shop contract terms to nevertheless prohibit the use of union fees of an objecting member for purposes not related to the union's core representative function–*i.e.*, for political and similar purposes. *See Commercial Workers of Am. v. Beck*, 487 U.S. 735, 762-63 (1988); *Ellis v. Brotherhood of Ry., Airline & Steamship Clerks, Freight Handlers, Express & Station Employees*, 466 U.S. 435, 447-48 (1984); *Brotherhood of Ry., Airline & Steamship Clerks, Freight Handlers, Express & Station Employees v. Allen*, 373 U.S. 113, 118-19 (1963); *International Ass'n of Machinists v. Street*, 367 U.S. 740, 768-69 (1961). In a separate line of cases, the Court has relied on the First Amendment to conclude that a similar rule applies to

public-sector employee unions. *See Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 515-19 (1991); *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 301-02 (1986); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235-36 (1977). Although these lines of cases are somewhat different in their approaches to the dues objector issue, the courts have "drawn from each line freely in considering the rights of fee objectors." *Nielson v. International Ass'n of Machinists & Aerospace Workers*, 94 F.3d 1107, 1113 (1996).

In *Hudson*, the Court "addressed the procedures that unions must follow in informing non-members about the agency fees and in responding to their objections to the calculation of fees." *Harik v. California Teachers Ass'n*, 326 F.3d 1042, 1046 (9th Cir. 2003). Although *Hudson* was limited to the procedures with respect to these specific issues, the Courts have construed *Hudson* as providing guidance on the validity of all procedures adopted by a union in connection with dues objectors. *See, e.g.*, *Seidemann v. Bowen*, 499 F.3d 119, 123-24 (2d Cir. 2007); *Shea v. International Ass'n of Machinists & Aerospace Workers*, 154 F.3d 508, 517 (5th Cir. 1998). Under *Hudson*, the procedures employed by a union must be "narrowly drawn" to ensure that a member's First Amendment right not to have his dues used to fund objectionable political activity is protected, *see Seidemann*, 499 F.3d at 123-24, but need not use the least restrictive means possible, *see id.* at 124. In addition, the Court has repeatedly made clear that an objecting member has the initial burden of making known to the union his objection. *See Allen*, 373 U.S. at 118-19; *Street*, 367 U.S. at 774; *cf. Davenport v. Washington Educ. Ass'n*, 127 S. Ct. 2372, 2379 (2007). The Supreme Court has not itself considered the adequacy of procedures employed by a union for a member to make known his objection. However, in light of *Hudson* and the general burden on members to make known their objections, the courts have generally upheld reasonable administrative procedures. *See,*

*e.g.*, *Nielson*, 94 F.3d at 116-17 (upholding procedure requiring objection to be lodged within one-month "window" each year); *Abrams v. Communications Workers of Am.*, 59 F.3d 1373, 1381-82 (D.C. Cir. 1995); *Tierney v. City of Toledo*, 824 F.2d 1497, 1506 (6th Cir. 1987) ("Since *Hudson* places the burden of objection upon the employees . . . , we do not consider unreasonable the plan's provision that each member be required to object each year . . . .").

Here, there is no dispute that IAM's procedures explicitly provide that a request for dues objector status must be made in the form of a letter signed by the objector, and must include the objector's home address and lodge number, if known. *See* Compl., Ex. E; Merritt Dep., at 120-21 & Ex. 9. Plaintiffs do not claim that they had no notice of this requirement. The only evidence proffered by plaintiffs that they requested dues objector status are three March 2006 letters–one from each of NWA's major hubs in Detroit, Minneapolis, and Memphis–signed by a number of QSAs. These letters do not, however, include the home address of any of the signatories, *see* Compl., Ex. D; Ketland Dep., Ex. 76; Pinckney Dep., Ex. 41; Dowdy Dep., Ex. 18, and admittedly did not comply with IAM's procedures, *see* Merritt Dep., at 119-20. Plaintiffs do not claim that any of them filed a proper request for dues objector status in compliance with the published IAM requirements, nor have they offered any evidence to support such a claim.

Rather, plaintiffs argue that the IAM has imposed "arbitrary limitations on seeking objector status" and required members to "jump through unlawful IAM procedural hoops." Pl.s' Br., at 31. However, plaintiffs present no argument or law to support their assertion that the requirement of a home address is arbitrary or unlawful. As noted above, a union may adopt reasonable administrative procedures for making known a member's objection, so long as those procedures are narrowly drawn to ensure that the member's First Amendment rights are not implicated. Plaintiffs do not, as

they cannot, argue that the requirement of providing a home address is anything other than a *de minimis* requirement, and there is nothing to suggest that this requirement is not "narrowly drawn" or in any way imposes a burden on a union member's First Amendment rights. Nor is the requirement of a home address arbitrary. As defendants correctly note, "[c]urrent address information enables the Union to send follow up correspondence regarding the objection, including disclosures regarding the calculation of the agency fee[.]" Def.s' Br., at 25. And, as defendants further note, these disclosures are mandated by the Supreme Court. *See Hudson*, 475 U.S. at 306-07.[7]

In short, plaintiffs have failed to provide any evidence that they made a proper request for objector status in accordance with IAM's established policies, nor have they provided any legal basis to question the validity of those policies. They thus cannot establish that defendants violated their duty of fair representation, or otherwise denied them rights to which they are entitled by virtue of the RLA or the First Amendment. Accordingly, the Court should conclude that defendants are entitled to summary judgment on plaintiffs' dues objector claims.

D.     *Defendants' Motion for Rule 11 Sanctions*

Defendants also move for sanctions, in the form of costs and attorney fees, under Federal Rule of Civil Procedure 11. Specifically, defendants claim that they are entitled to Rule 11 sanctions

---

[7]Plaintiffs cite *Lutz v. International Ass'n of Machinists & Aerospace Workers*, 121 F. Supp. 2d 498 (E.D. Va. 2000) in support of their contention that "[d]efendants have been on notice for many years that arbitrary limitations on seeking objector status are unlawful." Pl.s' Br., at 31. Plaintiffs' reliance on *Lutz* is misplaced. In *Lutz*, the court struck down an IAM policy which required dues objectors to raise a new objection each year. The court found that this policy prohibiting a continuing objection had no legitimate basis, and thus unnecessarily burdened objecting members' First Amendment rights. *See Lutz*, 121 F. Supp. 2d at 506-07. Specifically, the court noted that the policy was not justified by any legitimate need of the union. Here, as explained above, the union has demonstrated a legitimate need for address information, and the burden imposed by the address requirement is much less than the burden of yearly objection imposed by the policy at issue in *Lutz*.

with respect to: (1) claims relating to several plaintiffs who have never been employed by NWA as QSAs; (2) claims relating to plaintiffs who were not QSAs during the time periods relevant to the complaint; (3) dues objector claims relating to plaintiffs who never made a request for dues objector status or who were not paying dues at the time their requests were made; and (4) plaintiffs' untimely claims based on the Accretion Agreement. The Court should grant in part and deny in part defendants' motion.

1.     *Rule 11 Generally*

In relevant part, Rule 11 provides:

> By presenting to the court a pleading, written motion, or other paper–whether by signing, filing, submitting, or later advocating it–an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

FED. R. CIV. P. 11(b). The rule further provides that "[i]f, after notice and an opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED. R. CIV. P. 11(c)(1). Any sanction imposed under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expense directly resulting from the violation." FED. R. CIV. P. 11(c)(4).

"Rule 11 sanctions are not tied to the outcome of litigation; the relevant inquiry is whether a specific filing was, if not successful, at least well founded." *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 553 (1991). "Failure on the merits is *not* synonymous with frivolousness." *D'Aquino v. Citicorp/Diner's Club, Inc.*, 139 F.R.D. 357, 360 (N.D. Ill. 1991) (emphasis added). "The court imposing Rule 11 sanctions need not make a finding of bad faith." *United States v. Shuch*, 139 B.R. 57, 62 (D. Conn. 1992). Likewise, "an attorney's good faith is not a defense" to the imposition of Rule 11 sanctions. *Jackson v. Law Firm of O'Hara, Ruberg, Osborne, & Taylor*, 875 F.2d 1224, 1229 (6th Cir. 1989). "The conduct of counsel that is the subject of sanctions will be measured by an objective standard of reasonableness under the circumstances." *INVST Fin. Group v. Chem-Nuclear Sys.*, 815 F.2d 391, 401 (6th Cir. 1987); *Jackson*, 875 F.2d at 1229; *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1296 (5th Cir. 1994); *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1177 (D.C. Cir. 1985). Under this test,

> "the relevant question is no longer whether the signer subjectively believed that a claim was legitimate. Rather, it is whether a competent attorney (or party), after appropriate investigation, would have reasonably believed that the claim was well grounded in fact and law."

*Kenna v. United States Dep't of Justice*, 128 F.R.D. 172, 176 (D.N.H. 1989); *see also, Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 758 (1st Cir. 1988); *Shrock v. Altru Nurses Registry*, 810 F.2d 658, 661-62 (7th Cir. 1987). Sanctions should be imposed when

> it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend modify, or reverse the law as it stands.

*International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir. 1989). Put another way, "where it is patently clear that a claim has absolutely no chance of success under the

existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, Rule 11 has been violated." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985). To determine whether a reasonable inquiry has been made, the court should consider the time available to the attorney to prepare the document, whether it contained a plausible view of the law, and the complexity of the legal issues involved. *See Brown v. Federation of State Med. Bds.*, 830 F.2d 1429, 1435 (7th Cir. 1987).[8]

2. *Whether Plaintiffs' Counsel Violated Rule 11*

a. *Improperly Named Plaintiffs, Plaintiffs Not Employed at Relevant Times, and Dues Objector Plaintiffs*

Defendants contend that plaintiffs' counsel failed to conduct a reasonable investigation into the factual basis for the claims of a number of the individuals listed in the complaint as plaintiffs. First, seven named plaintiffs were never employed by NWA as QSAs.[9] *See* Roma Decl., ¶ 5 & Ex. 4; Fawaz Dep., at 5-6; Ketland Dep., at 11. Second, although the complaint alleges that all of the plaintiffs were employed as QSAs as of the date of filing and at other times relevant to the complaint, *see* Compl., ¶ 2, discovery has revealed that 37 plaintiffs[10] were not yet employed as

---

[8]Rule 11 also contains a "safe-harbor" provision, providing that a party seeking Rule 11 sanctions must serve the motion on the opposing party 21 days prior to filing it with the Court, giving the opposing party that interval in which to withdraw or amend the offending pleading. *See* FED. R. CIV. P. 11(c)(2). There is no dispute that defendants have complied with Rule 11(c)(2).

[9]The seven are Mike Barlow, Ronald Box, Assad Fawaz, Richard Ketland, Charles Pogue, Harry Lee, and Dale Stroud.

[10]Jacquelyn Alexander, Mary Ellen Archer, Marta Box, Dawn Carroll, Charlie Casgrain, Alessandro Cinque, Elizabeth Fawaz, Mike Fedea, Carol Fossey, Vincent Gonella, Marjorie Goddell, Ella Gordon, Faye Hadley, Kay Johnson, James Kinsey, Karen Kowalewski, Beatrice Laughton, Fiona Lee, Jamara Lee, Cheryl Meininger, Kathleen Milne, Ella Mitchell, Patti Mogren, Leonora Raimondi, Joanne Roberson, Kristi Ruprecht, Dan Sancho, Sherry Sandey, Jaclyn Semlak, Sharon Shaw, Hazel Snow, Carl Stone, Robert Tucker, Marsha Venet, Tom Wagonsomer, Diane Waterson, and Neha Zalawadia.

QSAs at the time of the Accretion Agreement, *see* Roma Decl., ¶ 6; eight plaintiffs[11] were no longer employed as QSAs when the Bankruptcy Agreement was ratified, *see id.*, ¶ 7; and 13 plaintiffs[12] were no longer employed when the pay scales became effective, *see id.*, ¶ 8. With respect to the dues objector issue, it is clear that no claim is available for the 59 plaintiffs[13] who admittedly never requested dues objector status and for the 16 plaintiffs[14] who had cancelled their membership or stopped paying dues prior to request dues objector status. Plaintiffs' complaint makes no effort to set forth the claims with respect to the individual plaintiffs, although plaintiffs could have set forth such individual claims. *See Bautista v. Los Angeles County*, 216 F.3d 837, 840-41 (9th Cir. 2000); FED. R. CIV. P. 10(b). Indeed, plaintiffs should have done so in light of the fact that, based on the varying circumstances of the plaintiffs, "there may be defenses available to the defendants which are applicable to one or more plaintiffs but not to the others." *Enrone Corp. v. Skouras Theatres*

---

[11]Virginia Barkai, Geraldine Burnham, Dawn Carroll, Alessandro Cinque, Clara Curle, Cheryl Meininger, Kristi Ruprecht, and Muhammad Salah-Ud-Din.

[12]Gail Ann Blanchard, Elizabeth Fawaz, Ella Gordon, Jean Guerin, Mary Lou Ketland, Fiona Lee, Jamara Lee, Joanne Roberson, Lavonne Samlaska, Sharon Shaw, Robert Tucker, Tom Wagonsomer, Joyce Wilmes.

[13]Masumi Abeler, Mary Ellen Archer, Virginia Barkai, Freda Benfell, Patricia Berglund, Walterine Bishop, Laverne Bobbit, Hiroko Boerger, Marta Box, Karen Carlin, Dawn Carroll, Charlie Casgrain, Maylee Chen, Ernestine Christion, Janet Court, Clara Curle, Renee Dukes, Debora Edstrom, Mike Fedea, Mary Filice, Jeanne Forbes, Carol Fossey, Loretta Gaulmon, June Gruska, Renee Hardaway, Yuko Helman, Virginia Hurley, Hope Johnson, Kay Johnson, Angela Joins, Mary Lou Ketland, James Kinsey, Karen Kowalski, Mike Kroll, Fiona Lee, Kathleen Lystig, Patti Mogren, Edith Moss, Marieon Mustful, Yolanda Myers, Leora Neely, Rebecca Noel, Amy Perkins, Susan Priebe, Barbara Raschke, Audrey Robins, Janie Robinson, Kristi Ruprecht, Lavonne Samlaska, Sondra Scott, Jaclyn Semlak, Phyllis Spann, Rhodora Talampas, Nancy Thompson, Chun Van Zandt, Marsha Venet, Tom Wagonsomer, Carolyn Williams, and Neha Zalawadia.

[14]Mary Ellen Archer, Marilyn Barlow, Mary Buckley, Diane Delmont, Elizabeth Fawaz, Karen Fish, Kathleen Forystek, Ella Gordon, Jean Guerin, Jane Hofner, Debra Juul, Carolyn Menzer, Katherine Murphy, Janolyn Nelson, Cynthia Ryan, and Vera Sleiman.

*Corp.*, 19 F.R.D. 299, 300 (S.D.N.Y. 1956).

In any event, the effect of the complaint as alleged is to aver that defendants violated the duty of fair representation with respect to all plaintiffs in connection with both the Accretion Agreement and the Bankruptcy Agreement, and failed to provide dues objector status to all plaintiffs. And as the plaintiffs' discovery responses discussed above establish, such averments are demonstrably false with respect to a number of plaintiffs. More importantly, these facts would have been revealed to counsel had counsel taken the minimal step of interviewing each of the plaintiffs they purported to represent. Plaintiffs do not assert in their response to defendants' motion that counsel conducted any investigation into the basic employment history of each plaintiff. Further, the evidence suggests that this is so. Various plaintiffs testified that at some point several plaintiff began to solicit money from individuals to join in this action, generally $50.00. These plaintiffs became a "Litigation Steering Committee," which kept records of the individuals who had given them money and turned those lists and funds over to counsel. *See* Dowdy Dep., at 10-11; Hadley Dep., at 17-18; Merritt Dep., at 40-41; Pickney Dep., at 14. Counsel apparently did nothing more than take the names from this list and list them as plaintiffs in the complaint, and neither counsel nor plaintiffs suggest otherwise. This lack of any inquiry by counsel clearly violates Rule 11. *See Steib v. Lastrada Inn, Inc.*, No. 92-2204, 1993 WL 8302, at *9 (E.D. La. Jan. 11, 1993); *Whittington v. Ohio River Co.*, 115 F.R.D. 201, 206 (E.D. Ky. 1987) ("An attorney has not made a 'reasonable inquiry' concerning the facts if he has not made any inquiry[.]").[15] Accordingly, the Court should conclude that sanctions are appropriate

---

[15]With respect to the eight plaintiffs who were never employed as QSAs, plaintiffs contend that these plaintiffs were inadvertently included as a result of a clerical error. Specifically, plaintiffs note that "the initial participation in the suit was evidenced by payments made in accordance with a retainer agreement. In a few instances, checks were drawn on joint accounts. A few spouses appeared on the initial . . . list" of plaintiffs. Pl.s' Br. in Opp'n to Def.s' Mot. for Rule 11 Sanctions, at 7. However, under Rule 11 the inquiry is an objective one, and even an innocent or good faith error is sanctionable

with respect to these issues.

### b. Accretion Agreement Claim Barred by the Statute of Limitations

Defendants also contend that plaintiffs violated Rule 11 by asserting their DFR claim based on the Accretion Agreement, when a minimal investigation of the law would have revealed that the claim was barred by the statute of limitations. The Court should disagree. As explained above, there is no case law addressing the circumstances present here, and although I ultimately conclude that plaintiffs' argument is not persuasive, their argument that the claims related to the Bankruptcy Agreement are timely is certainly not frivolous. As to the Accretion Agreement claims, this presents a closer question, as the claims clearly appear to be well outside the six month limitation period. However, plaintiffs' argument that claims did not become ripe until the issues involved in the Accretion Agreement were made part of the Bankruptcy Agreement, which was the result of the negotiations regarding the expired CBA, is not so baseless as to warrant the imposition of sanctions under Rule 11. In light of the paucity of law with respect to the specific limitations issues presented by the case, it cannot be said that plaintiffs' legal position was so objectively unreasonable as to be frivolous under Rule 11(b)(2). *See Greeley Pub. Co. v. Hergert*, 233 F.R.D. 607, 612 (D. Colo. 2006); *Herbert v. Reinstein*, 976 F. Supp. 331, 340 (E.D. Pa. 1997).

### 3. *Appropriate Sanction*

Turning to the appropriate sanction to impose for the conduct found to violate Rule 11, the Court should conclude that an award of reasonable attorney fees to defendants for the fees incurred in establishing the propriety of the individual plaintiffs' claims. Such an award is likely to deter

---

if a reasonable investigation would have uncovered the error prior to filing. *See Lloyd v. Schlag*, 884 F.2d 409, 412 (9th Cir. 1989). Here, "[i]f counsel had made even minimal inquiry [of his clients] before signing the complaint, no 'clerical error' would have occurred." *Kuzmins v. Employee Transfer Corp.*, 587 F. Supp. 536, 538 (N.D. Ohio 1984).

what happened here–a "shotgun" naming of plaintiffs with no investigation by counsel–by placing the financial onus on counsel should the named plaintiffs later appear to have no or significantly limited claims. *Cf. Gilbreath v. Clemens & Co.*, 212 Fed. Appx. 451, 466 (6th Cir. 2007) (approving district court's "make whole" sanction imposed as a result of DFR claim brought by plaintiff who had no standing to bring claim because he was not a party to the arbitration at issue). However, such an award must be limited only to those specific costs and fees "directly resulting from the violation." Fed. R. Civ. P. 11(c)(4); *see also*, *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 989 F.2d 213, 217-18 (6th Cir. 1993). Thus, if the Court agrees with my conclusion above regarding the propriety of Rule 11 sanctions, the Court should require defendants to provide a detailed schedule of the costs and fees incurred as a result of the Rule 11 violation. This schedule should be in the form of an affidavit of counsel with appropriate supporting documentation, and should include the nature of the task, the hours spent on the task, and that hourly rate at which the task was billed. The schedule should be sufficiently detailed to permit the court to examine the extent to which the task was necessitated by the Rule 11 violation, as well as the reasonableness of both the hours claimed and the rate billed. *Cf. Bodenhamer Bldg. Corp.*, 989 F.2d at 221. To the extent possible, defendants must segregate those costs incurred by reason of sanctionable conduct from those costs incurred by reason of non-sanctionable conduct.[16] The Court should then give plaintiffs an opportunity to object to any costs or fees claimed which plaintiffs believe are unreasonable or not related to the Rule 11 violation, after which the Court may–either on its own or through referral of the matter back to me–determine the appropriate sanction.

---

[16]For example, if a plaintiff was not employed as a QSA at the time of the Accretion Agreement but was employed as a QSA at the time of the Bankruptcy Agreement, defendants are entitled to reimbursement only for those costs and fees incurred in discovering the former fact, not for the entire amount incurred in preparing interrogatories or conducting a deposition of that plaintiff.

## III.    Conclusion

In view of the foregoing, the Court should conclude that there is no genuine issue of material fact with respect to the limitations issue, or the merits of plaintiffs' DFR and dues objector claims, and that defendants are entitled to judgment as a matter of law.  Accordingly, the Court should grant defendants' motion for summary judgment.

The Court should also conclude that plaintiffs' counsel violated Rule 11 by failing to conduct an adequate investigation into the nature of the individual plaintiffs' claims, and that defendants are entitled to the costs and fees incurred in ferreting out the plainly invalid claims of the individual plaintiffs.  The Court should also conclude, however, that plaintiffs' pursuit of the DFR claim relating to the Accretion Agreement is not sanctionable under Rule 11.  Accordingly, the Court should grant in part and deny in part defendants' motion for sanctions, and should direct further proceedings regarding the amount of the sanction as set forth above.

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2),

a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives _____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 9/22/08

<table>
<tr><td>The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on September 22, 2008.<br><br>     s/Eddrey Butts ____<br>     Case Manager</td></tr>
</table>